UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------X
                                                                  :
ALLISON MICHELE CRUZ, on behalf of herself and all                :
others similarly situated,                                        :
                                                                  :
                                          Plaintiff,              :
                                                                  :
                    -v-                                           :
                                                                  :
JKS VENTURES, INC.,                                               :
                                                                  :
                                          Defendant.              :
                                                                  :
------------------------------------------------------------------X
```

┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                │
│ DATE FILED:__6/21/2024___            │
└─────────────────────────────────────┘

23-cv-8311 (LJL)

MEMORANDUM AND
ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiff Allison Michele Cruz ("Plaintiff") and Defendant JKS Ventures, Inc., doing business as Incredible Pets ("Defendant"), jointly move for approval of a proposed consent decree, resolving Plaintiff's complaint for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12182 *et seq*., and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-107 *et seq*. Dkt. No. 17. For the following reasons, the motion is granted.

## BACKGROUND AND PROCEDURAL HISTORY

This is a typical ADA website action that the parties purport to resolve in an atypical fashion. Plaintiff, a legally blind person who uses screen-reading software to navigate Internet websites, brings this putative class action on behalf of all blind and visually-impaired individuals protected by the ADA, alleging Defendant's website is inaccessible. Dkt. No. 9 ¶¶ 2, 14, 39.[1] Defendant is a commercial establishment which sells diverse and high-quality pet products, and

---

[1] The Court takes the allegations of the Amended Complaint as true for purposes of this motion only.

operates the website, www.incrediblepets.com (the "Website").  *Id.* ¶¶ 4, 23, 41.  Plaintiff alleges

that the Website is not equally accessible to blind and visually-impaired consumers.  *Id.* ¶ 6.

On August 17, 2023 and again on September 10, 2023, Plaintiff attempted to access the

Website from her home in the Bronx, using screen-reader software, in order to purchase dog toys

for her son's dog.  *Id.* ¶¶ 13, 20–22, 39, 42.  She encountered barriers that denied her full and

equal access to Defendant's online goods, content, and services, and was unable to complete the

purchase due to the inaccessibility of the Website.  *Id.* ¶¶ 20, 24.  In particular, due to

Defendant's failure to build the Website in a manner that is compatible with screen-reader

programs, "Plaintiff was unable to understand and properly interact with the Website and was

thus denied the benefit of purchasing" the "Kong Airdog SqueakAir Ball Dog Toy" that she

wished to buy through the Website.  *Id.* ¶¶ 25, 40, 42.  The barriers included but were not limited

to: missing alt-text, hidden elements on web pages, incorrectly formatted lists, unannounced pop-

ups, unclear labels for interactive elements, and the requirement that some events be performed

solely with a mouse.  *Id.* ¶ 43.  The Website also contained a host of broken links to non-existent

or empty webpages.  *Id.* ¶ 44.  Despite the "direct harm and frustration" that Plaintiff has

experienced due to the inaccessibility of the Website, she intends to attempt to access the

Website in the future to purchase products and services offered by the Website, including the

"Kong Airdog SqueakAir Ball Dog Toy."  *Id.* ¶¶ 29, 46.

On September 20, 2023, Plaintiff filed this putative class action, alleging that

Defendant's Website violated Title III of the ADA, as well as the NYCHRL.  Dkt. No. 1 ¶¶ 7–8.

Plaintiff claims that the Website, and the goods and services offered thereupon, constitute a

public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7)(j).  *Id.*

¶ 16.  She alleges that because compliance with Web Content Accessibility Guidelines

("WCAG") would provide her and other visually-impaired consumers with equal access to the Website, Defendant has engaged in acts of intentional discrimination by failing to ensure that the Website is compliant with WCAG.  *Id.* ¶ 51.  Plaintiff also alleges that Defendant lacks a corporate policy that is reasonably calculated to cause the Website to become and remain accessible.  *Id.* ¶ 54.  Plaintiff alleges that class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) "because Defendant has acted or refused to act on grounds generally applicable to the class, making appropriate both declaratory and injunctive relief with respect to Plaintiff and the Class as a whole."  *Id.* ¶ 62; *see* Fed. R. Civ. P. 23(b)(2).  She also alleges that class certification is appropriate under Rule 23(b)(3) because facts and legal questions common to class members predominate over questions affecting only individual class members, and because a class action is superior to other available methods for the fair and efficient adjudication of the litigation.  Dkt. No. 1 ¶ 63.  She seeks injunctive and declaratory relief under federal law, and compensatory and punitive damages under the NYCHRL.  *Id.* at 20–21.

On October 3, 2023, Plaintiff filed an Amended Complaint.  Dkt. No. 9.  The Amended Complaint seeks identical relief based on identical allegations to the original complaint.[2]

On February 8, 2024, the parties jointly requested judicial approval of a proposed consent decree ("First Proposed Consent Decree").  Dkt. No. 17.  Among other things, the First Proposed Consent Decree required Defendant to "take appropriate steps as determined to be necessary with the goal of ensuring full and equal enjoyment of the goods, services, privileges, advantages, and accommodations provided by and through the Website (including all pages therein), including websites (including all pages therein and linked to therefrom) that can be navigated to

---

[2] It appears that the difference between the original complaint and the Amended Complaint is that it corrects a typo in the spelling of Plaintiff's name in the case caption.  *Compare* Dkt. No. 1 at 1, *with* Dkt. No. 9 at 1.

[or] from the Website or which when entered reroute to the Website." *Id.* ¶ 13.  Specifically,

Defendant was required, "within 24 months of the Effective Date of the Consent Decree," to

"modify the Website as needed to substantially conform to the [WCAG] 2.0 and/or [WCAG] 2.1

Level A Success Criteria or any other WCAG guidelines deemed to be applicable, in such a

manner so that the Website will be accessible to persons with vision disabilities." *Id.* ¶ 13(a).[3]

The parties were explicit regarding one of the principal purposes of the First Proposed

Consent Decree.  In presenting the parties' joint request for judicial approval of the decree,

counsel for Defendant explained that it was "designed to serve as a shield for Defendant against

claims by other potential plaintiffs who may come forward to assert similar claims based on the

putative access violations that are being addressed and resolved pursuant to this settlement."

Dkt. No. 17 at 2.  Counsel elaborated: "Duplicative suits have been a recurring problem in

similar matters handled by my law firm and other attorneys defending these matters around the

country."  *Id.*  To that end, the First Proposed Consent Decree included a provision that it was

intended to benefit all other blind or visually-impaired individuals:

> The Parties to this Consent Decree expressly intend and agree that this Consent
> Decree shall inure to the benefit of all persons with vision disabilities as defined by
> the ADA, including those who utilize a screen reader to access the Website and
> members of the class identified in the Complaint, which persons with disabilities
> shall constitute third-party beneficiaries to this Consent Decree.

*Id.* ¶ 20.

The First Proposed Consent Decree provided that the Defendant would not be in violation

of its obligations under the decree "unless: (a) an independent accessibility consultant determines

---

[3] Version 2.1 of the Web Content Accessibility Guidelines ("WCAG 2.1") is published by the
World Wide Web Consortium, known throughout the world as W3C, which is an international
website standards organization. Dkt. No. 9 ¶ 34.  Plaintiff alleges that WCAG 2.1 are well-
established guidelines for making websites accessible to blind and visually-impaired persons and
are universally followed by most large business entities and government agencies to ensure
websites are accessible.  *Id.*

that a particular item(s) cannot be accomplished by a person with a disability who has average screen reader competency using a prominent commercially available screen reader such as Jaws, Voiceover, or NVDA in combination with one or the following browsers . . . : Internet Explorer, Firefox, Safari and Chrome; and (b) Defendant fails to remedy the issue by seeking to use Reasonable Efforts within a reasonable period of time." *Id.* ¶ 16.  Critically, any dispute with respect to whether Defendant used "Reasonable Efforts" were subject to dispute resolution procedures which require notice and an opportunity to cure.  *Id.* ¶¶ 10, 14–15.  The First Proposed Consent Decree contained a reciprocal fee-shifting provision: the Court, in its discretion, would have authority to award reasonable attorneys' fees and costs to the prevailing party in an enforcement action.  *Id.* ¶ 15.  The effect of these provisions is to require Plaintiff to obtain and show proof that the Defendant is in non-compliance before an enforcement action is brought and to put on Plaintiff, as well as on Defendant, the risk that if its position in court did not prevail, it would be liable for the attorneys' fees for the other side.

On February 9, 2024, the Court issued an order requesting further information about the First Proposed Consent Decree, noting that the proposed decree contained "an unusual provision" that could be read to bar all persons with disabilities from filing suit against Defendant for website inaccessibility for the three-year duration of the consent decree, without asking the Court to certify the class action.  Dkt. No. 18 at 1.  The Court instructed the parties to address "specifically whether the consent decree is intended to do more than give . . . third parties rights under the decree without detracting from any rights that they might enjoy under substantive law," including the ADA.  *Id.* at 2.

Defendant filed a response on February 16, 2024, with the consent of Plaintiff.  Dkt. No. 19.  Defendant stated that the First Proposed Consent Decree did "not purport to bind non-parties

including members of the putative class identified in the Complaint." *Id.* at 1.  But counsel reiterated that "the purpose of the Consent Decree is to provide protection to Defendant[], . . . against potential copycat lawsuits by other plaintiffs who may come forward to assert similar claims based on the putative access violations that are being address and resolved pursuant to this settlement." *Id.*  Counsel again stated that "[d]uplicative suits have been a recurring problem in similar matters handled by my law firm and other attorneys defending these matters around the country," and that "the Consent Decree agreed to by the parties attempts to provide a measure of protection for Defendant against similar claims for a three-year period." *Id.*  Counsel pointed to *Hanyzkiewicz v. Allegiance Retail Services, LLC*, in which a court in this District invoked the All Writs Act, 28 U.S.C. § 1651(a), to dismiss a follow-on complaint challenging the ADA-compliance of a defendant's website, when that defendant had previously been sued for an ADA-website violation and whose compliance with the ADA was already subject to a so-ordered consent decree.  2023 WL 2758355, at *3 (S.D.N.Y. Apr. 3, 2023).  The court there concluded that permitting plaintiff to seek equitable remedies for website accessibility violations that already were the subject of another court decree "*could* frustrate the consent decree" and "might disrupt the already existing Consent Decree." *Id.*  Defense counsel here asserted that "if a potential plaintiff concludes that the website remains inaccessible in violation of the ADA, that individual could seek to intervene" in the case pending before this Court.  Dkt. No. 19 at 1.

On February 26, 2024, the Court entered a Memorandum and Order scheduling a hearing to address whether the First Proposed Consent Decree could be approved, and directing the parties to submit supplemental briefing to that end.  Dkt. No. 20 at 14.  The Court stated the applicable standard as requiring assessment of: "(1) the basic legality of the proposed decree; (2)

whether the terms of the decree, including its enforcement mechanism, are clear; (3) whether the consent decree reflects a resolution of the actual claims in the complaint; and (4) whether the consent decree is tainted by improper collusion or corruption of some kind." *Id.* at 10 (citing *U.S.S.E.C. v. Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 294-95 (2d Cir. 2014)).  The Court stated that the record before it raised an air of potential collusion.  *Id.* at 12–13.  As the Court noted, "the settlement was reached within days, perhaps hours, of defendant being made aware of the lawsuit and on the eve of the Christmas holiday," and there was no evidence of adversarial negotiations or that the parties exchanged any materials besides the formulaic complaint upon which Defendant would have been made aware of the specific problems with the Website.  *Id.*

On March 11, 2024, Defendant submitted supplemental briefing.  Dkt. No. 21. Defendant reiterated the prevalence of "copycat lawsuits by other would-be plaintiffs," and asserted that the First Proposed Consent Decree "attempts to provide a measure of protection for Defendant against similar claims for a three-year period."  *Id.* at 1–2.  The Court held a hearing on March 22, 2024.  *See* 03/22/2024 Minute Entry.  The Court expressed its concern at the hearing regarding whether the decree provided enforceable measures for curing the alleged violation of the ADA, or rather, would operate simply to frustrate the efforts of any third party to enforce the ADA against Defendant.  The Court gave the parties the option of submitting a revised proposed consent decree or having the Court rule on the First Proposed Consent Decree. The parties opted to revise the decree.

On April 10, 2024, Defendant submitted an amended consent decree ("Second Proposed Consent Decree").  Dkt. No. 22.  The Second Proposed Consent Decree adds the following language:

> Plaintiff's Complaint alleges that the barriers on the Website include: missing alt-text, hidden elements on web pages, incorrectly formatted lists, unannounced pop

ups, unclear labels for interactive elements, the requirement that some events be
performed solely with a mouse, and various broken links ([Dkt. No. 9] ¶¶ 43 and
44), and Plaintiff has provided a report that documents and provides specifics
concerning these alleged access barriers.

Dkt. No. 22-1 ¶ 13.  The Second Proposed Consent Decree also adds language regarding the

specific steps that Defendant will take in order to comply with Title III of the ADA:

> Defendant's remediation will include making changes to address Plaintiff's
> allegations of missing alt-text, hidden elements on web pages, incorrectly formatted
> lists, unannounced pop ups, unclear labels for interactive elements, the requirement
> that some events be performed solely with a mouse, and various broken links.

*Id.* ¶ 14(d).  The Second Proposed Consent Decree also obliges Defendant to update the Court

every six months for the duration of the 24-month remediation period:

> Defendant agrees to provide written status reports to the Court every six (6) months
> until the expiration of the 24-month remediation period . . . . Such status reports
> shall identify the measures Defendant has taken to remediate the issues alleged by
> Plaintiff in paragraphs 43 and 44 of the Complaint and as stated in Paragraph 13 of
> this Consent Decree.

*Id.* ¶ 14(e).  Responding to the Court's concerns about its authority to itself change the consent

decree, the parties added that they "consent to any modifications that the Court may deem

necessary and appropriate for this Consent Decree to be so-ordered."  *Id.* ¶ 23.

On June 10, 2024, the Court issued an Order scheduling a telephonic conference for June

21, 2024.  Dkt. No. 23.  The Order directed the parties to inform the Court whether they would

further modify the Second Proposed Consent Decree to require that changes to the Website be

made "as soon as reasonably practicable" and to require further changes to the reports to be made

by the parties on a bi-annual basis.  *Id.*  By letter dated June 17, 2024, the parties indicated that

they were prepared to make those changes to the Second Proposed Consent Decree.  Dkt. No. 25.

On June 19, 2024, Defendant submitted to the Court the Decree currently under consideration.

Dkt. No. 28-2.  On June 20, 2024, the Court expressed its approval of the Decree in an Order.

Dkt. No. 29.  This Memorandum and Order sets forth the Court's reasoning.

## DISCUSSION

The Second Circuit has held that a district court reviewing a consent decree must "assess (1) the basic legality of the decree; (2) whether the terms of the decree, including its enforcement mechanism, are clear; (3) whether the consent decree reflects a resolution of the actual claims in the complaint; and (4) whether the consent decree is tainted by improper collusion or corruption of some kind." *Citigroup*, 752 F.3d at 294–95 (internal citations omitted); *see also Sec. & Exch. Comm'n v. Caledonian Bank Ltd.*, 317 F.R.D. 358, 369 (S.D.N.Y. 2016). As the Second Circuit has recognized, "[c]onsent decrees vary, and depending on the decree a district court may need to make additional inquiry to ensure that the consent decree is fair and reasonable." *Citigroup*, 752 F.3d at 295.[4] But "[t]he primary focus on the inquiry" is "ensuring the consent decree is procedurally proper." *Id.*

## I.     Decree Legality

The Decree is legal under the standards set forth in *Citigroup*. A proposed consent decree is legal "so long as it is within the Court's authority to enter the decree and within the Plaintiff's authority to enforce it." *United States v. Int'l Bus. Machs. Corp.*, 2014 WL 3057960, at *1 (S.D.N.Y. July 7, 2014) (citing *Benjamin v. Jacobson*, 172 F.3d 144, 158 (2d Cir. 1999)). "[C]ourts in this circuit analyzing this factor have looked to whether the relevant statutes under which the action was brought permit the relief requested in the consent decree." *United States v. N.Y.C. Hous. Auth.*, 347 F. Supp. 3d 182, 200 (S.D.N.Y. 2018) (collecting cases); *see also Caledonian Bank*, 317 F.R.D. at 370.

---

[4] The Circuit has explained that inquiry as to the "adequacy" of a consent decree is not part of a court's analysis of whether the settlement is "fair and reasonable" or would disserve the public interest, stating that since "[s]crutinizing a proposed consent decree for 'adequacy' [would] borrow[] from the review applied to class action settlements, [it is] particularly inapt in the context of a proposed [government] consent decree." *Citigroup*, 752 F.3d at 294.

The Decree purports to effect relief under the ADA on behalf of a plaintiff who claims to have been (and continues to be) the victim of discrimination under the ADA.[5]  The relief accorded by the Decree falls squarely within the case made by the pleadings, and that permitted and contemplated by the ADA. *See Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986) (holding that "a consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction").  It includes the obligations not to deny any persons with a disability (as defined under the ADA), the opportunity to participate in and benefit from the goods, services, privileges, advantages, and accommodations through the Website, to use reasonable efforts to provide persons with a disability an equal opportunity to participate in and benefit from the goods, services, privileges, advantages, accommodations provided through the Website, and to use reasonable efforts to ensure that persons with a disability are not excluded, denied services, segregated, or otherwise treated differently because of the absence of auxiliary aids and services through the Website.  Dkt. No. 22-1 ¶ 12.  The Decree then defines with some specificity how Defendant is required to come into compliance with the ADA: within 24 months of the effective date of the Decree, Defendant is required to modify the Website to substantially conform to the Web Content Accessibility Guidelines 2.0

---

[5] The parties contend that the catch-all modification provision providing that they each consent to "any modifications that the Court may deem necessary and appropriate for this Consent Decree to be so-ordered," Dkt. No. 22-1 ¶ 23, enables this Court to modify the proposed decree as it sees fit.  But it is well established that "[a] district court only 'has the power to enter or reject such a judgment, not alter it,'" *N.Y.C. Hous. Auth.*, 347 F. Supp. 3d at 197 (quoting *S.E.C. v. Petro-Suisse Ltd.*, 2013 WL 5348595, at *3 (S.D.N.Y. Sept. 25, 2013)).  Just as a court cannot modify a contract, it cannot modify the terms of a consent decree.  *See, e.g.*, *AIU Ins. Co. v. TIG Ins. Co.*, 934 F. Supp. 2d 594, 602 (S.D.N.Y. 2013) ("[A] valid modification of a contract must satisfy all the criteria essential for a valid original contract, including offer, acceptance, and consideration. . . .  [M]utual assent [is] as much a requisite element in effecting a contractual modification as it is in the initial creation of a contract."); *accord Mount Vernon City Sch. Dist. v. Nova Cas. Co.*, 968 N.E.2d 439, 444 (N.Y. 2012).  Accordingly, the Court considers the Decree as drafted.

and/or the Web Content Accessibility Guidelines 2.1 "or any other WCAG guidelines deemed to be applicable, in such a manner so that the Website will be accessible to persons with vision disabilities" and "defendant's remediation will include making changes to address Plaintiff's allegations of missing alt-text, hidden elements on web pages, incorrected formatted lists, unannounced pop ups, unclear labels for interactive elements, the requirements that some events be performed solely with a mouse, and various broken links." *Id.* ¶ 14(a), (d).  All of these obligations fall within the ambit of the jurisdiction conferred by the ADA and the remedies permitted by that statute. *See Swift & Co. v. United States*, 276 U.S. 311, 330–31 (1928); *see N.Y.C. Hous. Auth.*, 347 F. Supp. 3d at 200 ("[C]ourts in this circuit analyzing this factor have looked to whether the relevant statutes under which the action was brought permit the relief requested in the consent decree."); *Caledonian Bank*, 317 F.R.D. at 370.  None requires a defendant to do, pursuant to court order, that which it would be prohibited from doing by positive law. *See, e.g.*, *In re Birmingham Reverse Discrimination Emp. Litig.*, 833 F.2d 1492, 1498 (11th Cir. 1987); *United States v. Alex. Brown & Sons, Inc.*, 963 F. Supp. 235, 240 (S.D.N.Y. 1997) ("Generally speaking, parties to a consent decree cannot 'consent' to disregard otherwise valid law, or 'consent' to enlarge their own legal rights.").

The principal question with respect to the legality of the Decree arises from the avowed purpose of the Decree "to serve as a shield for Defendant against claims by other potential plaintiffs who may come forward to assert similar claims based on the putative access violations that are being addressed and resolved pursuant to this settlement." Dkt. No. 17 at 2.  The question is raised by paragraph 21 of the Decree, which provides that "persons with disabilities shall constitute third-party beneficiaries to this Consent Decree." Dkt. No. 22-1 ¶ 21; *see also id.* ¶ 5 (providing that the Decree "inure[s] to the benefit of individuals who are blind or have low

vision").  The relief obtained by Plaintiff is limited and arguably falls short of that which would be required in a litigated case under the ADA.  Defendant is required to ensure that the Website only "substantially conforms" to the WCAG guidelines "determined to be applicable."  Dkt. No. 22-1 ¶ 14(a).  The Decree provides that: "if the U.S. Department of Justice or a Court with jurisdiction over this matter determines that the WCAG standards or any successor standard that Defendant may have utilized are not required by applicable law, Defendant may choose, in its discretion to cease the remediation efforts" to conform to WCAG guidelines so that the Website will be accessible to visually-impaired persons.  *Id.* ¶ 14(b).  The "Reasonable Efforts" standard calls only for those efforts "that a reasonable person or entity in Defendant's position would use to achieve that goal or obligation" and does not require efforts that would constitute an undue burden if the Website were a standalone business entity, *id.* ¶ 10, and even if the WCAG guidelines remain in effect, Defendant is relieved from complying with those guidelines, if it "sought to use Reasonable Efforts" and reasonably relied on a number of alternative guidelines "or any combination thereof," *id.* ¶ 14(c).  Although Defendant is required to make changes to address certain of Plaintiff's allegations, there is no detail with respect to those allegations or with respect to the required changes.  *Id.* ¶ 14(d).  Defendant is not in breach of the Consent Decree unless "an independent consultant" makes the requisite determination and "Defendant fails to remedy the issue by seeking to use Reasonable Efforts within a reasonable period of time."  *Id.* ¶ 17.  Even then, if the Plaintiff bring an enforcement action and loses, she may be liable to pay attorneys' fees to Defendant.  *Id.* ¶ 16.  Plaintiff is free to agree to these provisions as a compromise of its claims against Defendant.  *See United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971).  To the extent that the Decree would have the effect of foreclosing any relief to a third party other than that granted to Plaintiff under the Decree and to require a third

party to satisfy the procedural requirements of the Decree in lieu of the procedural requirements to obtain relief under the ADA, the Decree would raise substantial questions of its lawfulness.

The Court does not read the Decree to foreclose a third party from getting the full relief available to that third party under the ADA.  Supreme Court has squarely held that parties may not bind non-parties by entering consent decrees.  *See, e.g.*, *Martin v. Wilks*, 490 U.S. 755 (1989), *abrogated on other grounds as recognized in Landgraf v. USI Film Prods.*, 490 U.S. 755 (1989).  It follows that parties may not restrict the legal rights of non-parties by including in a consent decree provisions purporting to bind them.  *See, e.g.*, *Antrim Min., Inc. v. Davis*, 775 F. Supp. 165, 168 (M.D. Pa. 1991).  Indeed, the Second Circuit has expressly held that "parties may not use a consent decree to limit non-party rights that would otherwise prevail."  *United States v. Bleznak*, 153 F.3d 16, 19 (2d Cir. 1998).

A court cannot approve a consent decree that "conflicts or violates" an applicable statute. *Int'l Ass'n of Firefighters*, 478 U.S. at 519.  "Although a consent judgment is enforceable by the court, the source of the court's authority to require the parties to act is the parties' acquiescence, not rules of law." *Id.* at 522; *see also City of Warren v. City of Detroit*, 495 F.3d 282, 287 (6th Cir. 2007).  Therefore, "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement."  *Int'l Ass'n of Firefighters*, 478 U.S. at 529.

The effect of the Decree may be to require any third party who seeks injunctive relief with respect to the Website to file a complaint and a motion to intervene with this Court while the Defendant here is in the process of remediating its alleged violations of the ADA under the Court's supervision.  "[T]he All Writs Act empowers a district court to enjoin actions by a nonparty when necessary to protect the court's jurisdiction over a consent decree. *See United*

*States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 911 F. Supp. 743, 750 (S.D.N.Y.), *aff'd*, 96 F.3d 653 (2d Cir. 1996).  A court thus may enjoin the pursuit of a parallel action seeking injunctive relief with respect to property that is already the subject of a consent decree before another court and require the plaintiff to file a motion to intervene when pursuit of the parallel action "*could* frustrate the consent decree."  *Hanyzkiewicz*, 2023 WL 2758355, at *3.  It does not follow, however, that the putative intervenor who seeks injunctive relief against the defendant's unlawful action is limited to enforcing the consent decree or to the relief set forth in the decree.  "[T]he Second Circuit has held that 'the terms of a consent decree cannot be enforced against those who are not parties to the settlement.'"  *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 911 F. Supp. at 750 (quoting *Ass'n for Retarded Citizens of Conn., Inc. v. Thorne,* 30 F.3d 367, 372 (2d Cir. 1994), *cert denied*, 513 U.S. 1079 (1995)).

The Decree does not limit third parties who have claims under the ADA against Defendant to the relief provided under the Decree or require such third parties to comply with the procedural requirements imposed on Plaintiff under the Decree.  If Defendant wanted that protection, the answer was for it to agree that a class be certified under Federal Rule of Civil Procedure 23(b)(1)(A).  *See, e.g.*, *Anchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) ("Rule 23(b)(1) covers cases in which separate actions by or against individual class members would risk establishing 'incompatible standards of conduct for the party opposing the class.'" (quoting Fed. R. Civ. P. 23(b)(1)(A))); *cf. Martin*, 490 U.S. at 763 ("[A] party seeking a judgment binding on another cannot obligate that person to intervene; he must be joined.").  In that way, others who were similarly situated to Plaintiff would receive notice of the decree to which they would be subject and an opportunity to object.  Because the parties followed the

route of a non-class consent decree that nonetheless benefits third parties, another plaintiff who in the future complains that the Website is unlawful in violation of the ADA will, by virtue of Rule 71 and the third-party beneficiary provisions of the Decree, be able to enforce the Decree against Defendant. *Berger v. Heckler*, 771 F.2d 1565, 1565–67 (2d Cir. 1985); *see also Brennan v. Nassau County*, 352 F.3d 60, 65 (2d Cir. 2003); *Hanyzkiewicz*, 2023 WL 2758355, at \*3. If, in fact, Defendant has remediated and is in compliance with the ADA, the Decree will have served the stated purpose of serving as a shield against duplicative, meritless lawsuits. If, notwithstanding the Decree, Defendant is not in compliance with the ADA, the third party will also be able to seek injunctive relief different from that awarded to Plaintiff, as long as the relief that it seeks would not conflict with the Court's "still-in effect Consent Decree." *Id.* And, if she prevails in its intervention, it will be able to recover attorney's fees, *see, e.g.*, *Pascuiti v. N.Y. Yankees*, 108 F. Supp. 2d 258, 265 (S.D.N.Y. 2000); *Favors v. Cuomo*, 29 F. Supp. 3d 276 (E.D.N.Y. 2014), without the reciprocal fear that if she loses she will be at risk of an attorneys' fees award under the same standards applicable to a party seeking to enforce the Decree, *see Christianburg Garment Co. v. EEOC*, 434 U.S. 412 (1978). If it forces other would-be plaintiffs to file their ADA actions against the Website in this Court, rather than elsewhere, the Decree will simply have the salutary effect of centralizing in one court in one District all efforts to reform the Website. In that permissible way, and not in the impermissible way of preventing lawsuits, the Decree thus will ensure that Defendant is not subject to conflicting obligations. The Decree is lawful.

## II.    Clarity

"A consent decree is clear when it 'properly defines its key provisions.'" *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 2024 WL 476367, at \*15 (S.D.N.Y. Feb. 7, 2024) (quoting *Int'l Bus. Machs.*, 2014 WL 3057960, at \*3)); *United States v. Chestnut*

*Petroleum Dist., Inc.*, 2020 WL 5505298, at *2 (S.D.N.Y. Sept. 11, 2020); *see also Citigroup*, 752 F.3d at 295.

The terms of the Decree, included its enforcement mechanism, are clear.  It defines "who may bring an enforcement action, for what kinds of violations, and so forth."  *Angela R. by Hesselbein v. Clinton*, 999 F.2d 320, 325 (8th Cir. 1993), *cited in Citigroup*, 752 F.3d at 295; *see also Int'l Bus. Machs.*, 2014 WL 3057960, at *3 (holding that decree is sufficiently clear where the decree details "specific enforcement mechanisms" and details "Defendants' responsibilities under the decree").  The Decree is "more specific than a simple command that the defendant obey the law."  *Am. Soc'y for the Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*, 60 F.4th 16, 22 (2d Cir. 2023) (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001)).  It identifies the obligations of Defendant in terms specific and clear enough that Defendant can understand its obligations.  *See S.C. Johnson & Son*, 241 F.3d at 240–41; *Fed. Trade Comm'n v. Shkreli*, 2024 WL 1026010, at *3 (2d Cir. Jan. 23, 2024) (summary order).  Defendant is required within twenty-four months to modify the Website to substantially confirm to WCAG guidelines; it is required to address Plaintiff's allegations of Website violations; and it is required to provide written status reports to the Court every six months during the twenty-four-month remediation period.  Dkt. No. 22-1 ¶ 14(a), (d), (e).

The enforcement mechanism is clear and not "vague."  *N.Y.C. Hous. Auth.*, 347 F. Supp. 3d at 201.  The Decree sets forth in four paragraphs the procedures in the event of disputes, including the notice provisions that must be satisfied, the evidence that must be obtained before a claim is brought of a violation, where notice must be sent, and the relief that is available from the Court.  *Id.* ¶¶ 15–18.

### III.     Resolution of Claims

The Decree resolves the claims in the complaint.  *See Citigroup*, 752 F.3d at 295.  Where a proposed decree resolved "the actual claims in the complaint" by establishing "a remedial plan aimed to address and update the allegedly unlawful" conduct outlined in the complaint, courts have found that this factor from *Citigroup* has been satisfied.  *See, e.g.*, *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 2024 WL 476367, at *17.  The Proposed Decree is general, but it does purport to resolve the claims in the Complaint by requiring Defendant to take "reasonable efforts" to remediate the website within twenty-four months.  *See* Dkt. No. 22-1.

### IV.     Collusion

The most substantial issue is whether the Decree is infected by improper collusion or corruption of some kind.  *See Citigroup*, 752 F.3d at 295; *see also Kozlowski v. Coughlin*, 871 F.2d 241, 244 (2d Cir. 1989).

The Court found that there was evidence of improper collusion in connection with the First Proposed Consent Decree.  The First Proposed Consent Decree was reached in a hurried fashion within days of Defendant having been served with the Complaint.  There was no evidence of arms-length bargaining.  *See Armour*, 402 U.S. at 681 ("Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms."); *see also Baez v. N.Y.C. Hous. Auth.*, 533 F. Supp. 3d 135 (S.D.N.Y. 2021) ("A consent decree represents a compromise between parties who have waived their right to litigate in the interest of avoiding the risk and expense of continued litigation."); *see* Hearing Tr. at 11, 14. There was no evidence that Plaintiff had shared with Defendant any detail of its claimed violations; there also was no evidence that Defendant had shared with Plaintiff any information about its plans for remediation.  A declared purpose of the First Proposed Consent Decree appeared to have been to prevent third-party lawsuits.  The decree itself contained no mechanism

for Plaintiff to ensure that Defendant was engaged in remediation or for the Court to ensure that the obligations of the decree were more than a sham. There was the odor that Defendant had paid off Plaintiff or Plaintiff's counsel to obtain protection against duplicative lawsuits without any thought being given to the relief necessary to remediate the Website on behalf of the visually-impaired.

The subsequent history convinces the Court that the Decree now is more a product of cooperation between counsel than of collusion to defeat the claims of third parties. *Cf. S.E.C. v. Bank of Am. Corp.*, 2010 WL 624581, at *6 (S.D.N.Y. Feb. 22, 2010) (approving modified consent decree after court rejected original consent decree and stating "the considerable power given federal judges to assure compliance with the law should never be confused with any power to impose their own preferences"). After the Court called into question the propriety of the First Proposed Consent Decree, the parties made changes to that decree to incorporate specific measures that Defendant would take (if necessary) to ensure that the Website was ADA-complaint. *See* Dkt. No. 22-1 ¶ 14(d). Importantly, the Second Proposed Consent Decree also required the Defendant to make written status reports to the Court every six months on the measures it had taken to remediate those issues. *Id.* ¶ 14(e). Those measures went some way, but not all the way, to assuring the Court that the relief to which the parties had agreed was real and not just a façade erected for no purpose other than to impede claims by third parties. The Second Proposed Consent Decree still left open the possibility that the parties either would agree at the outset that the allegations made by Plaintiff in the complaint were ill-founded and thus would make no changes to the Website or that Defendant would forestall making changes to the Website through the term of the Decree. In either instance, the protections of the decree would be illusory. It would have no effect other than potentially to direct claims of third parties to this

Court and to make those parties go through the additional step in prosecuting their ADA claims of showing that the relief ordered by the Court was not sufficient to protect their rights.  But, the parties did not stop there.  In their most recent iteration of the decree, the parties have agreed to make the changes to the Website as soon as reasonably practicable, thereby protecting against the risk that Defendant would stall making any changes until after the decree expired.  And, the parties agreed to include in the bi-annual reports the efforts to ensure that the Website complied with the applicable WCAG Guidelines, thereby ensuring that at a minimum the Website could comply with those Guidelines.  No doubt there are additional measures the parties could have taken to be more protective of the rights of those visually-impaired or the Court could have ordered in the event that the Plaintiff prevailed on her claims.  But that is not the measure of the lawfulness of a decree.  A consent decree "normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *Int'l Ass'n of Firefighters*, 478 U.S. at 522 (quoting *Armour*, 402 U.S. at 681–82).

## CONCLUSION

For the foregoing reasons, the parties' joint motion for entry of the proposed consent decree is GRANTED.


SO ORDERED.


Dated: June 21, 2024
       New York, New York                    _____
                                                    LEWIS J. LIMAN
                                             United States District Judge